I'm Ashley McMillan with Sussman Godfrey, and I represent Appellant Jeffrey Varga, the official liquidator for the Palm Beach Offshore Funds. As this Court has held, the applicable standard for a motion to dismiss is whether or not the complaint contains sufficient factual matter accepted as true to state a cause for release. The plausibility standard is not a probability requirement. The factual allegations in the offshore funds complaint, which must be accepted as true for purposes of a motion to dismiss, provide ample support for the plausible conclusion that U.S. Bank aided and abetted breaches of fiduciary duty and was negligent. These allegations demonstrate that U.S. Bank was not only aware that the offshore funds managers were breaching duties by failing to abide by contractually mandated structural protections, but also that U.S. Bank assisted those managers in maintaining the false impression that those protections were in place. Because of U.S. There's a surprising inconsistency in this mandated question. The district court said it wasn't mandated. Your opposing counsel says it wasn't mandated. You repeatedly in the briefs, not personally, you repeatedly say mandated. This is Rule 12. Where is the, give me the paragraph number of the complaint you're relying on for the notion of mandated. In the contractual documents. In the contractual. And we also say that it was mandated outside of the contractual documents. I understand that, but that's a very indirect link to the bank, which was simply a servicing record keeper. Right. Right. But the bank did have possession of all the additional documents that we said that it was mandated. Where is it in either the 3,000 or the 3,200 collateral agreement? Where is the language that you're relying on for the assertion that you plausibly pled this was a mandate? We pled it throughout the complaint, Your Honor. The first example is, pardon me. Were the agreements attached to the complaint? They were not. The U.S. bank attached their agreements to their, the agreements to the motion to dismiss. So it's part of the Rule 12 record, you'd agree there. Yes. That's correct, Your Honor. So if you don't go to the complaint then, tell me the language in the agreements that are part of the record that you're relying on for the assertion that it was a mandated, contractually mandated obligation that the bank obviously knew about. The language is in Section 1B of the collateral account, and it says that the parties to the headers was to direct the wholesale retailers to make payments directly to the collateral account. So it's the word direct. Yes, Your Honor. Outside of the contractual agreements, as you know, the district court said that those agreements, which it did have in its possession, it said that those agreements did not mandate that the direct payment system be followed.  The direct payment system contained the direct payment system, marketing documents, and also due diligence materials. The due diligence materials were materials that were provided to U.S. bank by the offshore funds directors, and were actually, U.S. bank required those materials before it would open the escrow accounts. Also, the marketing materials were prepared with the assistance of U.S. bank. U.S. bank met with various marketers that were hired by the offshore funds to prepare, to help them prepare these marketing documents for the investors to the funds. So U.S. bank was aware that the offshore funds were paying marketers and telling them to go to U.S. bank to make sure that the information in the marketing materials was correct. And U.S. bank went through and helped them make very detailed descriptions of the direct payment system, including the diagrams that are shown in the complaint. Those are taken directly from the marketing materials and the due diligence materials. And U.S. bank knew that auditors and the offshore funds maintained those materials. And the assertion that up until what's called the recoding, it would have been apparent to anyone looking at the documents that PCI was directly paying the collateral accounts that that's not right. I thought the assertion by the bank's lawyers is that up until the monthly statements, or I guess the collateral accounts, sure, because we're not talking about the escrow accounts. Monthly statements made it obvious that the money was coming from PCI and not the retailers. Right. And then after the quote recoding, it was simply not, there was no allegation. So we had four years when everybody would know that the Palm Beach Capital partners were winking at the direction, the DPS system. Well, no, I disagree with that, Your Honor. Because for four years, there were investors and marketers of the accounts that were consistently contacting the representative of U.S. bank, Tom Carruth, whose name was on the due diligence materials as custodian, saying, when you're doing due diligence for the account, this is the contact information at U.S. bank. And these investors and marketers would contact Mr. Carruth and other representatives at U.S. bank and ask them to ensure that the direct payment system was being followed. And consistently, U.S. bank would say that payments were coming directly from wholesale retailers and confirm this when it in fact knew that this was not the case, that payments were coming directly from Tom Petters. But these same, who are these marketers? Who are they working for? They were hired by the offshore funds to prepare marketing documents in order to market to the investors. So they were hired by Prevost and Harold? Yes. And they were paid by the offshore funds. Okay. And the bank obviously would know they had access to the monthly statements. The marketers did not have access to the monthly statements. They're working for somebody who's getting them. Am I missing, you know, what? So as long as the marketers are dumb and blind, it's the bank's fault. Even aside from the monthly statements, I think on its own, the fact that U.S. bank consistently made misrepresentations about the flow of funds to anyone who asked. And the consistency. That's another disagreement in the Rule 12 briefing, which is a little surprising. I don't think that there's any disagreement. You consistently say this was a consistent thing, and the opposing counsel says one lie to one marketer does not an aid-in-bet case make. Well, we allege much more than one. We give one specific example of one name of one marketer who contacted the bank. And we quote the email that Tom Carruth sent to that marketer. But the allegations of the complaint say that it consistently happened in multiple meetings, in multiple phone calls, and multiple emails. It's your contention that that was enough to avoid a 12B6 ruling against you? Yes, Your Honor. That one? Well, it's based on more than just the one allegation. Not based on one, but that's one that you point to. That as well as altering the account statements. The recoding, is that? The recoding, correct. And it wasn't just U.S. bank characterized. Is it alleged that Carruth knew that that was a false statement? It is alleged that U.S. bank knew that the statements were false, and that the representatives of U.S. bank... What about Carruth? It is not alleged specifically that Carruth knew that it was false. However, in our response to the motion to dismiss, we made the point that if the court found that that one missing allegation, that Carruth knew it was false, was enough to dismiss the complaint, we were willing to file an amended complaint making that allegation. So to the extent that that's the reason that the court dismissed the complaint, I think the proper action would have been to allow us to amend the complaint, rather than dismissing it on that basis. If I may, I want to address just the aiding and abetting breach of fiduciary duty claim. As you all know, it has three elements. Under Minnesota law, a breach of fiduciary duty, knowledge, and substantial assistance. Unless the court has questions on the first element, breach of fiduciary duty, I'm basically going to rest on our briefing for that element. Both Harold and Prevost have pled guilty and been sentenced for securities... We still don't know any Cayman law. We cited Cayman law in our brief for breach of fiduciary duty, Your Honor. The elements are... The New York case, or... The New York case, which cites to Cayman law. The elements are a duty, a breach of fiduciary duty, and damage, based on that brief. You allege that under Cayman law, there were some fiduciary duties of some kind, but you don't point to a specific source. Is that what you're saying? No, we do point specifically to this source. Palm Beach Capital Management, which was owned and controlled by Harold and Prevost, we specifically say in the complaint that there were management agreements which say that they had a duty to ensure the... Ensure that the fund was well-protected, I think, is what... But so, through those management agreements, there was a duty. And also, just as managers of funds and as directors of the funds, they had duties of loyalty and good faith to the funds. Well... Those would be contractual obligations and not legal obligations arising from Cayman Island law. Or am I missing something here? Well, the Cayman Island law and breach of fiduciary duty, that, you know, they just... Cayman Island law says there has to be a duty. And so we just need to show that there's a duty. There's the management agreements, which are discussed in paragraph 23 of the complaint. The management agreements say that they... The managers need to use their best judgment and efforts in rendering services to the Palm Beach offshore funds. They were also directors of the offshore funds, which maintain their own fiduciary duties of loyalty to the funds, to not act against the best interests of the funds. Who was allegedly deceived by the recoded statements? The offshore funds were deceived by them because auditors of both the offshore funds and Palm Beach Finance, it was the same auditing company that worked for both, and they would have access to those funds and would have been... Was it alleged that they received the statements? It is not alleged that they received the statements. We do allege in paragraph 8 that the misrepresentations were conveyed to third-party service providers, which would have been the auditors of the funds. Because of the fact that U.S. Bank consistently misrepresented the source of funds and also altered these account statements, the causation is that U.S. Bank knew that, obviously, investors and marketers were relying on the direct payment system, and it knew that the marketers had been hired to put together these marketing materials, which specifically outlined the direct payment system. It's certainly a reasonable inference that U.S. Bank would know that had they told the truth and said the direct payment system was not being followed, the offshore funds would have found out, because... But getting to Judge Loken's point, from the pre-recoded statements, wouldn't they have known that the funds were coming directly from Petter's company? If they had looked at the statements at that time. The statements began being recoded in 2006. The offshore funds began their investments in 2005. So it was really only a year that the offshore funds, that these statements were coded this way. There's certainly reasonable inferences that can be drawn that Petter's initially paid it directly and then realized that he had to direct the wholesale retailers to pay it. And in that first year, it's true that there weren't recoding done in 2005, but it was not a very long time period in the life of the funds that the statements only showed Petter's. And on recoding, that's a characterization that U.S. Bank has made. We allege that it's more than just recoding. And U.S. Bank attaches to their briefing the actual statements. And I think it's on page 127, is the page that they cite, that they say shows that it was just simple recoding. On this page, you can see that there's specific transactions where the name Petter's is removed, and then words such as Sam's or Bosco's are on the next page. BJ's are inserted. So it says, receipt of funds, BJ's. Receipt of funds, Sam's. And Petter's is nowhere to be found. So it's not a simple recoding.  and the word Sam's was inserted into the statement. And so... It's not just recoding, it's altering the statements to remove the true source of funds and insert a false source of funds, which was wholesale retailers, which was not true, and which U.S. Bank knew was not true. I'm going to reserve... Do you agree that the funds, dollars, all went into the 3,000 account whose agreement made no reference to DPS? This was raised in the motion to dismiss papers. U.S. Bank brought up the 3,000 account. The account that's referenced throughout the complaint is only the 3,200 complaint. Only the 3,200 account. We are making no allegations about the 3,000 account or any money that went through that account. Our claims solely rest on the 3,200 account. But the bank's brief says more than that. It says the funds money actually went to the 3,000, not the 3,200. That's not correct. That might be what they say, but that's not correct. There was a very little amount of money from the offshore funds that ever went through the 3,000 account. The $700 million that U.S. Bank transferred from the offshore funds escrow account at U.S. Bank to the collateral account at U.S. Bank was to the 3,200 collateral account. So that's the only... Every reference to the collateral account in our complaint is a reference to the 3,200 account. I'd like to reserve my remaining time for rebuttal. Thank you. Mr. Wilson? Yeah? May it please the Court? My name is Rich Wilson. I'm here with my colleague, Wayne Moskowitz, with the law firm of Maslin, Edelman, Warman & Brand, and we represent the Appley, in this matter, U.S. Bank. I want to start by jumping right in with a couple of the points that the panel has raised, and in particular to the direct... the so-called direct payment system. And I submit to you that this direct... the so-called direct payment system that Mr. Varga and his counsel suggest is at the foundation of this case is an after-the-fact invention that did not exist in real time. Now, from the complaint, the amended complaint... And by the way, we are now dealing with the second complaint, an amended complaint. After an initial motion to dismiss, Mr. Varga responded by filing an amended complaint and asked the complaint that was before the district court and that Judge Kyle dismissed. But focusing on the direct payment system, what Mr. Varga alleges is that that is contractually mandated, that it's created pursuant to rules in a contract, and in particular in the collateral account agreements. That is simply not true. The collateral account agreements are before the court, and there are two of them. Now, we understand that Mr. Varga is not relying on one of the two agreements, but those agreements show us some very important things. They show us, number one, that the Cayman Islands funds, the only entities that Mr. Varga represents, the entities in whose shoes Mr. Varga stands, were not parties to the collateral account agreements. In fact, they were strangers to those agreements. They're not third-party beneficiaries. In fact, there's a provision in those agreements that says... ...on the briefs, and that doesn't preclude the fraud claim. It doesn't preclude the fraud claim, but the point is this. Those collateral account agreements, one of them provides nothing about direct payments at all. The other says just this. It says just that Petters agreed to direct third parties, the inventory purchasers, to pay directly into the funds. It doesn't require them to pay into the funds. They are not themselves parties to the agreements. There is no contractual provision that requires them to pay into the agreements. The only contractual covenant that is referred to, the sole basis for the supposed crucial protection, is that Petters promised to tell a third party, a non-party to the underlying agreement, to pay directly. But those agreements provide for something else that's very important in this case. Those agreements require U.S. Bank to accept for deposit into the account funds from Petters. Well, if an investor inquired of the bank, an investor who had been told that their protection was there would be direct payments through the collateral account, and the bank said, yes, there's nothing from Petters here, why is that so important in our analysis of whether 12b-6 is the appropriate way to dispose of this claim? That's the second fundamental foundation of law in Mr. Varga's case. Mr. Varga doesn't represent investors. He doesn't stand in the shoes of the investors. He can't make the claims of investors. He can only make the claims of the Cayman Islands funds. And it does him no good, it's really fuzzy thinking, to argue that a partial element of a claim by a third party, over whom he is not representing, let's say an investor, might have a claim against U.S. Bank. That's a claim that the investor would make. And so, yes, it's true that Mr. Varga relies very heavily on the possibility that U.S. Bank could have liability to third parties. Aren't these, quote, investors, they're the people that lost the money by putting it first in the funds, which then put it into this fiasco? Well, that's right. I don't understand the vast significance of this point. Well, let me see if I can explain it better than I have. If an investor has a claim against U.S. Bank for making a misrepresentation to the investor, the investor can make that claim, not the Cayman Islands funds. Let me pause. Give me a... Where has the U.S. Supreme Court said that? Well, here's where. Mr. Varga is representing only the Cayman Islands funds. And his claim against U.S. Bank is that Harold and Prevost, the investment managers, breached a fiduciary duty to the Cayman Islands funds. His claim is not that Harold and Prevost defrauded investors and that U.S. Bank aided and abetted that fraud of the investors. His claim is that Harold and Prevost breached a duty owed to the Cayman Islands funds. I think that argument gets nowhere with me. I mean, as a matter of causation, it's clear that if you... The way you defraud... The way you get investor money here was to keep the funds participating. Well, let me try it this way, then. This case is an aiding and abetting breach of fiduciary duty claim. And that's all it is. It's not an aiding and abetting fraud claim. And, in fact, Mr. Varga is very clear. He is not alleging that Harold and Prevost breached their duty to the Cayman Islands funds by defrauding investors.  by concealing information from the funds, which we submit is really not possible because that knowledge would be imputed to the funds. You just said two things that are synonymous to me. Pardon? I mean, you just described two frauds that are the same. But they aren't the same, Your Honor. They're not the breaches of duty that Mr. Varga is relying on. What he's relying on is Harold and Prevost making an investment decision to continue lending money that was eventually then invested in Petters. He is not basing his claim on Harold and Prevost defrauding third parties. And that's clear from his complaint. Isn't the Cayman Islands fund an amalgamation of the investors who invest in the fund? No, the fund is a corporation under Cayman Islands law. The investors are people who purchase shares in that corporation. And there's no representation that can flow from the corporation to the defrauded investors? That is exactly right. And in fact, if an investor dealt with U.S. Bank and felt he was defrauded, he would have a perfectly good opportunity and right to sue U.S. Bank for fraud. We are dealing with a complaint here. And we have to accept certain allegations as being true. But let's be clear about this. Mr. Spring, who's identified in the complaint, has never sued U.S. Bank for fraud. He's never sued U.S. Bank for making a misrepresentation to him. If he had a claim, he's the person who has standing to make that claim, not Mr. Varga. Mr. Varga stands only in the shoes of the Cayman Islands funds. And they are not making that claim. They are not claiming that the Cayman Islands funds... And they aren't, Your Honor. I know you're looking at me skeptically. But that is not the allegation in their amended complaint. They have just two alleged breaches of duty. And they do not include... This has nothing to do with the District Court's analysis of the case. Well, the District Court was exactly right in its analysis. The point I'm making is an additional point that the underlying breaches of fiduciary duty claims... Well, actually, let me try it a different way. The District Court did make it very clear that there is no claim by Mr. Varga on which he could assert a claim based on Mr. Spring being defrauded. And he made it clear in his footnote, I believe, that the claim... Let's be clear about this. Harold and Prevost did plead guilty to fraud. But that fraud was as a result of their having defrauded third parties. This case does not involve any claim that U.S. Bank is liable for Harold and Prevost's fraud of third parties. This case is a very clear one. It's based on an alleged breach of fiduciary duty under Cayman Islands law. And I'd like to turn to that, if I may, for just a moment. Ms. McMillan made reference to an investment management agreement as the source of the duty owed by Harold and Prevost to the Cayman Islands funds. That's an important agreement, because in addition to establishing who the investment manager was, it also provided that the investment manager would not be liable to the Cayman Islands funds unless it engaged in reckless conduct, broke the law, and a variety of things. In other words, it established a very high standard, none of which this amendment complaint alleges. In other words, in trying to allege the underlying, the first element of an aiding and abetting breach of fiduciary duty claim, you have to allege that the fiduciary breached some duty. Here, without referring to any specific Cayman Islands law, we've been told that the source of the duty is a contract, and that contract specifically and expressly limits the circumstances under which those investment managers can be liable to the funds. So, to allege the underlying breach of duty, it was incumbent upon Mr. Varga to allege that all of this high level of misconduct occurred, and he hasn't done that. All he's alleged is that it was a bad investment decision to continue lending money without the existence of this so-called direct payment system. And if I could, I'd like to get back to the direct payment system for just a moment. What I've told you is that the direct payment system was not a system at all. It is not a system, for example, to ask the person you're afraid that might steal money from you to tell other people to send the money to somebody else. That's not a system. A system would be  would enter into a contract with the inventory purchasers, in which the inventory purchasers promised to pay directly into the collateral account. That didn't happen. They're strangers to this so-called contract that created this. Yes, Your Honor. On this point, it's my reading that the District Court acknowledged that at least some fiduciary duties were owed to the funds under Cayman Island law. Then he went on to make his analysis, which you say is correct, but now you're saying that there is no fiduciary duty that is involved. What I'm saying is that although Mr. Varga has not identified any Cayman Island's law that creates the duty, I think that the District Court assumed that a corporation's board of directors owes some duty, and then he went to look at the actual allegations as to how that duty might have been breached. What he found, I think, was that number one, there was no allegation of fact that would support a conclusion that they concealed any information from the Cayman Island's funds. In fact, under U.S. law, and there's no reference to what the Cayman Island law might be, but under U.S. law, the knowledge of an agent is imputed to the principal. I think Judge Kyle was exactly right in finding that you can't conceal something from yourself. The second point that I think that Judge Kyle made is that they haven't alleged a breach of and this may be more of an argument than Judge Kyle's decision, but they haven't alleged a breach of duty by the fund managers because they haven't alleged how it is that those managers went about deciding to continue to lend money to the two that would then be relent to pedders. And what we know is, and Mr. McMillan made reference to it, Well, how are they going to allege that? Pardon? How are outsiders going to be able to Well, the Cayman Islands Fund had an investment manager, and they entered into a contract for that manager, not U.S. Bank, but for that manager to make the investment decisions. And what we don't know, because it's not alleged, and again, I grant the point that it's hard to know what, especially in this context, where a liquidator is brought in, but nonetheless, until you allege that the investment managers did something that met the high standard in the investment management agreement, in other words, they engaged in such terrible decision making in deciding to do this, then you haven't stated a claim that they breached the duty that they owed. And they haven't alleged that. And as Judge Kyle pointed out, for many years, I just think the plaintiff's case is much simpler. As I understand it, it's that the managers and the bank knew what the managers were doing. They created this system to assure investors that there were controls here. And the system was the payments would go direct from the retailers to the collateral account, or the collateral account. And if it's not mandated, then the managers don't have to do it. The managers don't have to run away from the relationship because Pedders is not complying. But if they continue to assure everybody that the system's in place and it's being obeyed, and it's not, then they're defrauding investors who are investing through the funds. Both points are exactly right, I believe. First, the system was not mandated. There was no system. Look at the private placement memo. It doesn't say that there was a system by which the purchasers have to pay directly into the collateral account. Here's what it says. Is that important if the banks told investors that there was a system and it wasn't being followed? Well, I think here we need to look at what the actual allegation in the amended complaint is as opposed to what the arguments are here in court. And that's not what the allegation in the complaint is. The amended complaint says that there was communication between his fellow, Jonathan Spring, and U.S. Bank. At least one communicator. That's right. So that's what they're charging this on, is Jonathan Spring. And I submit to you that if Jonathan Spring felt like he was defrauded, he could sue U.S. Bank. He hasn't done it. But beyond that, let me address the second point you made, Judge Loken, and that is that, first of all, there is no contractually mandated system. The private placement memo doesn't say that there's a system. It says only that Pedders, or actually it doesn't give his name, but it says only that the person financing this inventory or purchasing this inventory would tell someone to pay the payment directly. But as to your point, it's exactly right that this case, and I think this is critically important, this case is not an aiding and abetting fraud case. It's not. That's not the claim. And in any event, who was defrauded? It wasn't the Cayman Islands Hedge Fund. It would have been Jonathan Spring or some other investor in the fund. And I want to emphasize this point. Mr. Varga does not stand in their shoes. He doesn't. Now, he doesn't claim to. He makes a big deal about how U.S. Bank did bad things to third parties, but he does not claim that he has standing to obtain redress for those third parties' grievances. And he doesn't. The bank wins because the people who breached or allegedly breached the duty were making the decision for the play. No, that's not what I'm saying. It's just the bank wins because the only activity that's alleged against U.S. Bank is not as against the Cayman Islands funds. It relates to these third party investors, and they have their own claims. But the alleged breach of duty is by the fund's directors to the funds. That's right. And they do not allege that defrauding third parties was part of that breach of duty. And they can't. Third parties are the funds. No, they aren't the funds, Your Honor. The third parties are shareholders in the funds. Not as a legal entity, but that doesn't matter. It does matter. Corporate formation and formalities do matter. Because Varga cannot assert Mr. Spring's claims. What case do I read to understand an argument I'm not understanding? Well, I guess I would refer you to our brief itself, which I think we make the point. You said all these things, and I frankly didn't think they made sense in the brief. What case will bring home this distinction? Well, Your Honor, I can't give you the case by name, but the principle is a well-established legal principle that I cannot assert claims that belong to somebody else. I don't have standing to do it. And Mr. Varga does not allege that he has standing to assert Mr. Spring's claims or any investor's claims. And that is what this case really hinges on, is this mistake, what I call fuzzy thinking on the part of Mr. Varga, that a potential claim by a third party, in this case Spring, could give rise to a claim that he himself can pursue. And that is just wrong. And let me just, if I may, just refer very briefly to the account statements themselves, because there has been discussion about those. One of them is part of the record, and I encourage you to take a look at it if you want to. They're boring documents, but it starts, I believe, in the appendix at 117. And what it shows is that during that month, which relates to January of 2007, the transactions are all coded, and some of the coding shows that payments are coming from pedders. And I was very interested to learn that, although not alleged in the amendment of complaint, that these account statements went to the auditors. And if they did, the auditors would have seen that the funds were coming from pedders, at least in part. And then at some point, and I want to make this important point. The collateral account, the Cayman Islands funds are not parties to the collateral account. They aren't on that agreement. They don't have the right to receive account statements. They don't allege that they received them. They're now arguing that their auditors received them, or at least the auditors of the domestic funds received them. That also is not alleged in the amendment of complaint. But in any event, if you were to look at the account statements themselves, what you would see is that they don't have, there's no false statement in those account statements. What happened is is that at some point, Harold and Prevost, the people who were acting for the domestic funds, asked the U.S. Bank to change the format, and the source of funds was deleted. It wasn't changed. In other words, there is, if you look at these How do we know that fact? Well, you can look at the account statements. I mean, they show what they show. And they do not show any source of funds. This sounds like a summary judgment argument. Well, the account statements are part of the record, Your Honor. Well, how do we know that Prevost and Harold, focusing on the domestic funds side of the ledger, had persuaded the bank to do this recoding for all these innocent reasons? I'm sorry. We don't know why he did it. What we know is what they show. You just said that. You just said that. Well, we know that he was acting for the domestic funds, not the Cayman Islands funds. We also know what the account statements show. Who was asking? Harold and Prevost. In other words, the Cayman Islands funds were not parties to this account, and therefore they didn't have any control over the investments. And they do not allege that they saw the accounts. Why weren't Prevost and Harold acting on behalf of all the funds that were investing? Well, I think they were. It's just that if corporate formalities matter, and they should, because remember, Mr. Spring and the other investors made the decision to invest through the Cayman Islands funds, not to invest through the domestic funds, and those decisions have consequences. In this case, U.S. Bank had nothing to do with making any investment decision, and U.S. Bank, there is no allegation in this complaint of actual knowledge. Thank you, Your Honor. How much time do we have? If you agree with the district court that the collateral account did not mandate the direct payment system, we disagree with that finding. We believe that it was mandated by the district court, and it is crucial to our complaint. We do not allege a breach of contract as a third-party beneficiary. The elements of aiding and abetting breach of fiduciary duty, none of those elements, the breach of fiduciary duty, the U.S. Bank's knowledge of that breach of fiduciary duty, and U.S. Bank's substantial assistance, none of those rest on the fact that the collateral account was breached, because there's other documents and other actions by U.S. Bank and the fiduciaries. What duty was The duty was still to act in good faith for the funds by following the direct payment system, which was mandated, and this can be shown through the marketing materials, the due diligence materials, through the representations by the fiduciaries to the investors of the funds and to the innocent directors of the funds, and U.S. Bank was aware of this because it helped them prepare these materials, and they had knowledge of this. This is a contract claim. It's not a contract claim. Well, you said the duties arise through the contract, but then you're saying it's not a contract claim. The fiduciary duties arose pursuant to management agreements and also as the role of directors, and as Your Honor pointed out, the district court did find that there were fiduciary duties. The duties to comply with the direct payment system, we believe the contract mandates them and supports those, but if you don't find that the contract mandated them, we still have sufficient allegations besides the collateral agreement itself to show that the direct payment system was mandated through the offering memorandum, through the marketing materials, and through the due diligence materials. But you don't say the common law of the Cayman Islands erects this duty that I see here, or there's no statutory duty that's enacted by I assume there's some legislative force in play in the Cayman Islands. You're saying that all this, these duties arise under the terms of the contract, but we don't have a contract action. The duties do not all arise pursuant to terms of the contract. The duties arise as, because they were managers of, for the offshore accounts, and also they were directors for the offshore accounts, and there are corporate duties that are involved to act in good faith as the agents for the offshore accounts. And again, the Cayman Islands... The corporate law of the Cayman Islands supports that. Is that your point? Yes, Your Honor. The bank's false statements that it was being followed, were those alleged to only have been made to investors? To investors and third-party marketers are the allegations. We believe through this discovery, we might be able to allege more, but in the complaint, it's just that the banks consistently made these statements to investors and to third-party marketers, and that those misrepresentations would have been conveyed to third-party service providers, which would include auditors of the accounts. And again... Does Mr. Varga have standing to bring those kind of claims? Absolutely. He represents the funds, and the investor and the distinction between the investor and the funds themselves, again, for the elements of aiding and abetting breach of fiduciary duty, the fact that U.S. Bank made these misrepresentations, that still shows that they had knowledge that the fiduciary duties were being breached, and it still shows substantial assistance because had they at any point told anyone who asked that the direct payment system was not being followed, it's certainly a reasonable inference that the funds would have found out about it. Does the court order creating Mr. Varga's position and authority have any bearing on who he represents and who he's authorized to represent and how broad his authority is in pursuing fraud against the investors? His order appointing him as liquidator? Yeah, I understood that he is appointed by court order from the court in the Cayman Islands to straighten this mess out on behalf of the investors. Is that wrong? I didn't read that order or didn't look for it. I haven't read that order either. I don't know specifically. I do know as liquidator of the account, as he liquidates the assets for the offer funds, there are investors that are stakeholders in this, and that money goes to those who were harmed by this. Seems that court order might be a bit crucial to this issue of standing. That's being raised here now. And I would argue that U.S. Bank has not raised an issue of standing in any of its papers. I see. Until our argument today? Yes, Your Honor. I see. Okay. Thank you. Thank you, Counsel. It's a complex case, and it's been thoroughly and well-briefed and argued, and we'll take it under advisement. Your Honor, would you like counsel to submit the order? Is it handy? Thank you.